```
                  UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
```

| | |
|---|---|
| KYMBERLEY COLE ROSENCRANS, | : |
|  | : CIVIL ACTION NO. 3:17-CV-55 |
| Plaintiff, | : |
|  | : (JUDGE CONABOY) |
| v. | : |
|  | : |
| QUIXOTE ENTERPRISES INC. | : |
| (D/B/A "Adult World") | : |
| and | : |
| CHARLES ERIC MORROW, | : |
|  | : |
| Defendants. | : |
|  | : |

## **MEMORANDUM**

Here the Court considers Defendant's Motion for Summary Judgment filed on October 28, 2017. (Doc. 40.) With their motion, Defendants assert that Plaintiff does not have sufficient evidence or proof to establish sexual discrimination pursuant to Title VII. (Doc. 40 at 1.) Plaintiff contends summary judgment is not proper in this case in that she has established a prima facie case of sex discrimination and she has offered sufficient evidence from which a jury could find that the reasons offered by Defendants for her termination were pretextual. (Doc. 51 at 10-20.) For the reasons discussed below, the Court concludes Defendants' motion is properly granted.

### **I. Background**

Plaintiff was employed by Quixote Enterprises on November 9, 2015. (Doc. 40-1 ¶ 1; Doc. 49 ¶ 1.) Plaintiff was hired by Defendant Morrow, an owner of Quixote Enterprises, for the position

of district manager for several store locations. (Doc. 40-1 ¶¶ 2-3; Doc. 49 ¶¶ 2-3.) The parties dispute whether Plaintiff was hired on a trial basis. (*Id.*) They also dispute whether Defendant Morrow handles day to day operations of the business, including firing employees, or whether Chief Financial Office, Larry Schemery, runs the business. (Doc. 40-1 ¶ 3; Doc. 49 ¶ 3.)

Plaintiff had known Defendant Morrow since 2008 when she ran her own cleaning business and she cleaned his house. (Doc. 40-1 ¶ 1; Doc. 49 ¶ 1.) Plaintiff stopped working for Defendant Morrow for a period of time when she was a sales representative for Vintage Tub and Bath and resumed actively running her cleaning business when she was laid off from Vintage Tub and bath in April 2015. (Doc. 40-1 ¶¶ 5- 6; Doc. 49 ¶¶ 5-6.) At that time, Plaintiff called Defendant Morrow and asked if she could start cleaning his house again and he agreed. (Doc. 40-1 ¶ 10; Doc. 49 ¶ 10.)

Plaintiff and Defendant Morrow became friends in 2008, and they sometimes confided in one another during the 2008-2015 time period. (Doc. 40-1 ¶ 11; Doc. 49 ¶ 11.) Plaintiff and Defendant Morrow had sexual relations once in May of 2015. (Doc. 40-1 ¶ 13; Doc. 49 ¶ 13.) They dispute who initiated the encounter. (Doc. 40-1 ¶¶ 13-14; Doc. 49 ¶¶ 13-14.) Following the encounter, Plaintiff and Defendant Morrow remained friends, he continued to see other people, Plaintiff continued to clean his house, and they

2

occasionally went to functions together. (Doc. 40-1 ¶¶ 15-16; Doc. 49 ¶¶ 15-16.) Plaintiff avers that Defendant Morrow wanted to be more than friends. (Doc. 49 ¶ 16.)

Sometime after May 2015, Defendant Morrow told Plaintiff that he was having problems with a district manager in Quakertown, Pennsylvania, and Plaintiff expressed an interest in the job. (Doc. 40-1 ¶¶ 19-20; Doc. 49 ¶¶ 19-20.) Although Defendant Morrow asserts that he reluctantly agreed to let Plaintiff "apply to see if it would work out and if they would have a position for her" and he was concerned about her ability to perform all of the required duties, Plaintiff disputes that he expressed concern and states that he specifically and unconditionally offered her the job. (Doc. 40-1 ¶ 20; Doc. 49 ¶ 20.) Defendant Morrow's articulated concerns included the fact that she had four children, she would have to drive over an hour and a half to the Quakertown area, she would have to be available for emergencies, and he was not sure if she would be needed because the other district manager in the area was still employed in that capacity. (Doc. 40-1 ¶¶ 20-22.)

Defendants assert that Plaintiff was informed by Larry Schemerly that she was to report only to him and Sharon Greco and there were no communications with Defendant Morrow about her hire. (Doc. 40-1 ¶ 23.) As part of her paperwork, Plaintiff received a copy of the employee handbook which included an at-will employee provision and explained that the first three months of employment

were considered an evaluation period. (Doc. 40-1 ¶ 24; Doc. 49 ¶ 24.) Plaintiff also signed an acknowledgment that company policy prohibited intimate relationships between employees and all supervisors/owners. (Doc. 40-1 ¶ 25; Doc. 49 ¶ 25.)

Plaintiff began working on November 9, 2015, without a set schedule so she would call Sharon Greco, office manager, to find out where she was supposed to be for training as training was to take place at various stores. (Doc. 40-1 ¶ 26; Doc. 49 ¶ 26.) The parties dispute events which occurred during Plaintiff's employment: Defendant states that Plaintiff did not have Veteran's Day off but Plaintiff says she had the day off (Doc. 40-1 ¶ 27; Doc. 49 ¶ 27); Defendant states that Plaintiff used her personal computer at work against company policy and Plaintiff states she was using it to make lists of ideas of changes to make in the store (Doc. 40-1 ¶¶ 28-31; Doc. 49 ¶¶ 28-31); Defendant says Plaintiff was to receive training from an area manager at the company's Syracuse store but she declined to go to the training on three separate occasions but Plaintiff said the training was scheduled for the day after she was fired and she disputes that she declined to go to the training (Doc. 40-1 ¶ 32; Doc. 49 ¶ 32); and Defendant states that Plaintiff failed to work the weekend of November 15, 2015 (the day she got married) and she did not tell anyone she was getting married but called off work and came in late the following day but Plaintiff says she worked on Saturday, November 14, 2015,

4

and she told the manager of the store where she was working that she was eloping in Las Vegas on Sunday and Monday and would be home for her shift at 4:00 on Tuesday with the contingency plan that, if her flight were delayed, he would cover for her and she would make up the time later in the week (Doc. 40-1 ¶ 33; Doc. 49 ¶ 33).

Plaintiff and Defendant Morrow exchanged numerous texts while she was employed at Quixote Enterprises, many of them about Plaintiff receiving payment for the previous week's cleaning services. (*See* Doc. 41-11 at 2-4.) Plaintiff received that payment on Friday, November 13, 2015. (*Id.* at 3-4.) On Wednesday, November 18, 2015, Plaintiff texted Defendant Morrow requesting that he call her when he got a change "not business." (*Id.* at 3.) On Thursday, November 19, 2015, Plaintiff informed Defendant Morrow via text that she had gotten married over the weekend and he responded that he had heard. (*Id.*) They exchanged a few follow-up texts about the marriage on that date. (*Id.*)

Defendants aver that Larry Schemery decided to terminate Plaintiff on November 20, 2015, based on her lateness, playing on her personal computer during working hours, and general poor attitude. (Doc. 40-1 ¶ 34.) They further aver that Larry Schemery did not need Defendant Morrow's permission to fire Plaintiff and he did not receive it. (Doc. 40-1 ¶ 35.) Plaintiff denies that the reasons provided for her termination are factually accurate and further asserts that Defendant Morrow's approval to fire Plaintiff

was needed before she was fired and that he gave such permission. (Doc. 49 ¶¶ 34-35.)

On the same day, Plaintiff texted Defendant Morrow asking if she would have her company car by the time she left for Syracuse on Thanksgiving. (Doc. 41-11 at 2.) Defendant Morrow texted back "change of plans . . . talk to Larry in the office." (*Id.*) Approximately twenty minutes later, Plaintiff texted Defendant Morrow asking what was going on. (*Id.*) Forty-five minutes later she sent him another text stating

> I understand business and friendship are
> separate but I don't understand how you could
> do this to me as a friend. You didn't even
> give me a chance at this job. Theres [sic]
> definitely something more to this and its
> [sic] wrong. your [sic] wrong and nor the
> person I thought you were.

(Doc. 41-11 at 2.) Defendant Morrow responded "Ur just not working out and I gave the other girl another chance . . . U have a mgr job at the bar and a new husband." (*Id.*) Plaintiff replied "You didn't even give me a chance at the position you hired me for. I don't have the bar job bc I gave that up for a career with your company. So irregardless of my new husband, I have 4 children to support with no job. Im [sic] hurt. I thought you were my friend." (*Id.*)

## II. Discussion

### A. *Summary Judgment Standard*

Summary judgment is appropriate when the movant demonstrates

6

there is no "genuine issue as to any material fact." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). In determining whether a genuine issue of fact exists, a court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). Such inferences "must flow directly from admissible evidence." *Halsey*, 750 F.3d at 287.

The initial burden is on the moving party to show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citations omitted). The moving party may meet this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Id.* at 325. The non-moving party may not rest on the bare

7

allegations contained in his or her pleadings, but is required by Federal Rule of Civil Procedure 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Id.* at 324. "The non-moving party must show where in the record there exists a genuine dispute over a material fact.'" *Hankins v. Wetzel*, 640 F. App'x 130, 132 (3d Cir. Jan. 6, 2016) (not precedential) (quoting *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007)). "A mere 'scintilla of evidence in support of the [non-moving party]'s position will be insufficient' to create a genuine issue of fact." *Hankins*, 640 F. App'x at 132 (quoting *Anderson*, 477 U.S. at 252)).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## *B. Defendants' Motion*

With this motion, Defendants assert that Plaintiff fails to state a claim of a genuine issue of material fact to support her claim of disparate treatment based on gender under Title VII and the Pennsylvania Human Relations Act ("PHRA"). (Doc. 41 at 9.) Specifically, Defendants contend that Plaintiff has not presented

8

any evidence that men who were married during their employment with Quixote were not terminated while other women who became married during their employment were terminated. (Doc. 41 at 12.) Further, Defendants maintain that no evidence supports Plaintiff's claim that Defendant Morrow aided Quixote in discriminating against Plaintiff. (Doc. 41 at 13.) Finally, Defendants aver that Plaintiff is not entitled to punitive damages. (Doc. 41 at 14-15.)

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The parties agree that the three-step burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies to Plaintiff's sex discrimination claims.[1] (Doc. 41 at 10-11; Doc. 51 at 9-10.) First, the plaintiff must establish a prima facie case of sex discrimination. *See*, *e.g.*, *Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3d Cir. 2006). If she succeeds, the burden shifts to the defendant to advance a legitimate, non-discriminatory reason for its action. *Id.* If the defendant advances such a position, the burden shifts back to the plaintiff to prove that the nondiscriminatory explanation is merely pretext

---

[1] This analytical framework applies to both Title VII and PHRA claims. *See*, *e.g.*, *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000).

9

for discrimination. *Id.*

Defendants assert that Plaintiff has failed to establish a prima facie case of discrimination. (Doc. 41 at 12.) Plaintiff responds that she has made the requisite showing. (Doc. 51 at 11-14.) The Court concludes Plaintiff has not produced sufficient evidence to support her claims of sex discrimination at the initial stage of the *McDonnell Douglas* inquiry.

For a claim of gender discrimination, a plaintiff establishes a prima facie case by demonstrating (1) she is a member of a protected class, (2) she is qualified for the job, (3) the defendant took an adverse employment action, and (4) the circumstances surrounding the adverse action support an inference of discrimination based on the plaintiff's protected class. *See*, *e.g.*, *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *Sarullo v. USPS*, 352 F.3d 789, 797 (3d Cir. 2003). The plaintiff's burden at this stage is not onerous, *Texas Dep't of Comty Affairs v. Burdine*, 450 U.S. 248, 253 (1981), rather "there is a low bar for establishing a prima facie case of employment discrimination," *Scheidemantle v. Slippery Rock University State System of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). The Third Circuit Court of Appeals "has repeatedly emphasized that the requirements of the prima facie case are flexible, and in particular that 'the fourth element must be relaxed in certain circumstances.'" *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (quoting

10

*Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994)). *Pivirotto* stressed that "a plaintiff could meet her prima facie burden by demonstrating generally that 'she was either not hired for [a] position or was fired from it under circumstances that give rise to an inference of unlawful discrimination.'" 191 F.3d at 357 (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995).

Here, the question is whether Plaintiff has pointed to evidence sufficient to satisfy the fourth element, i.e., whether the circumstances surrounding the adverse action support an inference of discrimination based on the plaintiff's protected class. *See*, *e.g.*, *Makky*, 541 F.3d at 214. Plaintiff's protected class is her sex and she maintains that "Morrow held her to a different standard than male employees and that he fired her because she got married." (Doc. 51 at 10.) As stated in *Bryant v. International School Services, Inc.*, 675 F.2d 562 (3d Cir. 1982), this type of allegation is known as a "sex-plus" problem, which arises when a claim of sex discrimination is premised on an additional factor such as marital status. *Id.* at 573 & n.18 (citing *Phillips v. Martin Marietta Corp.*, 411 F.2d 1 (5h Cir.). *petition for reh'g denied*, 416 F.2d 1257, *vacated and remanded*, 400 U.S. 542 (1971)).[2] *Bryant* explained that "'[a] sex plus problem

---

[2] The history of this line of cases is summarized in *Coleman v. B-G Management of Colorado, Inc.*, 108 F.3d 1199, 1203 (10th Cir. 1997).

11

arises whenever an employer adds a criterion or factor for one sex (e.g., marital status), which is not added for the other sex.'" 675 F.2d at 573 n.18 (quoting B. Schlei and P. Grossman, *Employment Discrimination Law* (1976) at 337 n.127).  In this type of gender-plus claim, the fourth prong of the prima facie case requires that the plaintiff present evidence of the relevant comparator, i.e., "the evidence must show that women, or married women in particular, were treated in a manner which 'but for their sex would have been different.'"  *Bryant*, 675 F.2d at 575 (quoting *City of Los Angeles Dep't of Water v. Manhart*, 435 U.S. 702, 711 (1978)); *see also Nesselrotte v. Allegheny Energy*, Inc., Civ. A. No. 06-1390, 2009 WL 703395, at *11 (W.D. Pa. Mar. 9, 2009).  *Bryant* further explained that

> "[d]iscrimination against married women
> constitutes discrimination on the basis of
> sex only if a different standard, i.e., the
> marital status of the person, has been
> applied to men and women.  Absent proof of
> the standard applied to men, obviously the
> plaintiffs have not established that such
> standard differs from the one applied to
> women."

675 F.2d at 575 (quoting *Jurinko v. Edwin L. Wiegand Co.*, 477 F.2d 1038, 1044 (3d Cir.), vacated and remanded on other grounds, 414 U.S. 970 (1973)).  Thus, under this theory, a plaintiff must provide evidence that she was treated less favorably than a male comparator.  *Id.* at 575-76.

Absent comparator evidence, evidence of other circumstances

12

raising an inference of gender discrimination, such as impermissible stereotyping, may satisfy the fourth element of a prima facie case of sex discrimination. *See*, *e.g.*, *Nesselrotte*, 2009 WL 703395, at *11 (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004)).

Defendants maintain Plaintiff has not provided any appropriate comparitor evidence--she has not shown that men who were married during their employment with Quixote were not terminated. (Doc. 41 at 12.) Plaintiff responds that she has shown that men married during their employment with Quixote were not terminated, stating that "Defendants have admitted they did not fire any men because they were married or became married during the course of their employment." (Doc. 51 at 12 (citing Ex. 9 ¶ 4 [Doc. 50-9 at 2]).) Plaintiff's citation references a response contained in Defendants' Answer to Plaintiff's First Requests for Admission (Doc. 50-9). After objecting to the phrasing of the question, Defendants state that "Defendants Quixote and Morrow never fired anyone, male or female, because they were married or became married during their employment with Quixote." (Doc. 50-9 at 2.) Plaintiff provides no details in support of her statement that she has produced comparator evidence and the Court concludes that Defendants' answer does not show that a comparator exists. Thus, Plaintiff has not met her burden of producing evidence that she satisfies the fourth prong of the prima facie case on the basis of being treated

13

differently than men who were married while employed by Quixote.

This conclusion, however, does not foreclose other ways of satisfying the fourth prong. "[W]here the claim is that one was discriminated against personally on the basis [prohibited], statistical evidence concerning company-wide discharge patterns is tangential to the behavior of the relevant decision makers." *E.E.O.C. v. MCI Intern, Inc.*, 820 F. Supp. 1438, 1481 (D.N.J. 1993) (citing *Healy v. New York Life Ins. Co.*, 800 F.2d 1209, 1218 (3d Cir. 1988)). As noted above, evidence of stereotyping on the basis of sex may suffice. As stated in *Back*, "[i]t is the law, then, that 'stereotyped remarks can certainly be evidence that gender played a part' in an adverse employment decision," 365 F.3d at 122 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)). As to the crucial question of "[w]hat constitutes a 'gender-based stereotype'?," *Price Waterhouse*, *Back* and Third Circuit opinions on the nature of proof required, *see*, *e.g.*, *Healy*, 800 F.2d at 1218, indicate that the question must be answered "in the particular context in which it arises, and without undue formalization." 365 F.3d at 120. The cases have noted, "it takes no special training to discern sex stereotyping." *Id.* (citations omitted).

In this case, Defendant Morrow included the fact that Plaintiff had a "new husband" in his explanation for the employment action after he generically stated that Plaintiff was "just not working out" and he "gave the other girl another chance." (Doc.

14

50-6 at 1.) The implication that a woman did not need a job because she had a new husband to support her can be seen as a stereotypical view of a woman's need to work akin to "stereotypical views about women's commitment to work and their value as employees, . . . perceptions [which] lead to subtle discrimination that may be difficult to detect on a case-by-case basis." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003). Plaintiff also points to Defendant Morrow's explanation at his deposition that his alleged belief that Plaintiff would not work out in the position for which she was hired included the distance from her job and "'[s]he was a mother of four children, a single mother with four children" and he didn't know if it would matter if she was a man with four children. (Doc. 51 at 13 (citing Ex. 2 at 88-89 [Doc. 50-2 at 24]).) Regarding his text reference to Plaintiff's new husband, Defendant Morrow responded to the question of what effect her marriage had with the response "She's not my problem. She is not my problem. . . . It's not my job to support the girl. It is not my job. . . . Let him take care of her." (Doc. 51 at 14 (citing Ex. 2 at 94-95 ([Doc. 50-2 at 26]).)

While this evidence may show that Defedendant Morrow had a stereotypical view of women with children and married women, it does not show that Plaintiff was discharged in circumstances that support an inference of discrimination based on the plaintiff's protected class. *See, e.g.*, *Makky*, 541 F.3d at 214. The evidence

15

is deficient in that it does not show that Defendant Morrow was the decisionmaker or that those who testified to being the decision makers, Sharon Greco and Larry Schemery, expressed any sentiments similar to those expressed by Defendant Morrow. Importantly, it is the behavior of the decisionmaker that matters. *See*, *e.g.*, Healy, 800 F.2d at 128.

Plaintiff disputes that Mr. Schemery and Ms. Greco did not need permission from Defendant Morrow to fire her, that they did not receive permission from Defendant Morrow to fire her, and that they made independent hiring and firing decisions. (Doc. 49 ¶ 35.) Although Plaintiff supports these assertions with the statements that Defendant Morrow "testified that he is the boss and makes the major decisions that need to be made" and Ms. Greco "testified they need to get approval from Morrow before firing Rosencrans" (*id.* (citing Ex. 2 at 29 [Doc. 50-2 at 9]; Ex. 3 at 33 [Doc. 50-3 at 10])), Plaintiff's assertions are not supported by the record. When asked about his main responsibilities at his deposition, Defendant Morrow said "I'm the boss. I sign the checks. I sign the tax returns. I make the major decisions that need to be made." (Doc. 50-2 at 9 [Ex. 2 at 29].) However, shortly before being asked this question, Defendant Morrow was asked about the separation of a former employee and responded that he did not fire him adding that "I don't fire people, hire and fire people." (Doc. 50-2 at 9 [Ex. 2 at 27].) While Plaintiff is

correct that this could be seen as a self-serving statement by an interested witness which a jury would not be required to believe (Doc. 49 ¶ 35 (citing *Hill v. City of Scranton*, 411 F.3d 118, 129 n.16 (3d Cir. 2005)), deposition testimony of Sharon Greco and Larry Schemery support Defendant Morrow's assertion that he was not the decisionmaker. Plaintiff's assertion that Sharon Greco "testified they need to get approval from Morrow before firing Rosencrans" (Doc. 49 ¶ 35 (citing Ex. 3 at 33 [Doc. 50-3 at 10])), is not an accurate recitation of Ms. Greco's testimony. Ms. Greco testified that she discussed what to do with Plaintiff with Larry Schemery. (Doc. 50-3 at 10 [Ex. 3 at 33].) When asked if she thought she had to run it by Defendant Morrow before they fired her, Ms. Greco responded "[w]ell, we did. And then that's when he said do what you have to do. (*Id.*) She testified she believed that the call took place on the day Plaintiff was fired. (*Id.*) In another response she stated that Defendant Morrow "said to us, you know, it's up to you guys what you want to do with her. Leave me out of it." (*Id.*) When asked about her knowledge of Plaintiff's marriage, Ms. Greco responded that she did not know Plaintiff had been married during her two weeks of employment and, specifically, she did not know Plaintiff had been married when she talked with Defendant Morrow and he said "do what you have to do." (Doc. 50-3 at 9, 11.) Ms. Greco added, "[w]hy would I care?" (*Id.* at 11.)

Larry Schemery testified that he did not discuss the matter

17

with Defendant Morrow but Sharon Greco did sometime before he terminated Plaintiff on Friday, November 20th.  (Doc. 50-4 at 11.) He also testified that he and Ms. Greco talked about it, said she had "failed to do X. Y. and Z," that Ms. Greco did not tell him that they had gotten permission from Defendant Morrow to fire Plaintiff, and they did not need Defendant Morrow's permission. (*Id.*)  Regarding his knowledge of Plaintiff's marriage, Mr. Schemery testified that he did not know Plaintiff had gotten married during her employment with Quixote and he believed there was some discussion of it afterwards between Ms. Greco and some of the employees.  (Doc. 50-4 at 14.)

This evidence review indicates that Defendant Morrow expressed sexist attitudes about women but such a showing is not evidence that Plaintiff was fired under circumstances that give rise to an inference of discrimination on the basis of sex.  *See Makky*, 541 F.3d at 214.  Plaintiff's problem is that she has not presented evidence that she was fired by Defendant Morrow and she "must establish some causal nexus between [her] membership in the protected class" and the adverse employment action.  *Sarullo*, 352 F.3d at 798.  Thus, to satisfy her burden of establishing a prima facie case, Plaintiff would have to show that Defendant Morrow was a decisionmaker or that Ms. Greco and Mr. Shemery shared his attitudes or otherwise acted on a basis that gender discrimination could be inferred.  Because Plaintiff has not shown any of these

things, she has not shown the required causal nexus and has not presented evidence sufficient to satisfy her prima facie case.[3] Therefore, Defendants are entitled to summary judgment on Plaintiff's Title VII and PHRA claims.

### III. Conclusion

For the reasons discussed above, Defendants' Motion for Summary Judgment (Doc. 40) is GRANTED. An appropriate Order is filed simultaneously with this action.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: January 19, 2018

---

[3] In making this determination, the Court has thoroughly reviewed Plaintiff's Response to Defendant's Statement of Facts (Doc. 49) and her brief in opposition to Defendants' motion (Doc. 51). This review showed that nowhere does Plaintiff present evidence refuting the testimony of Ms. Greco and Mr. Schemery about who made the decision to terminate her and their lack of knowledge about her marriage. (*See* Doc. 51 at 1-23.) As discussed in the text, an unsupported assertion is not sufficient to defeat summary judgement. *Celotex*, 477 U.S. at 321; *Kaucher*, 455 F.3d at 423. Although Plaintiff lists numerous inconsistencies in discussing the third stage of the *McDonnell Douglas* inquiry (Doc. 51 at 19-20), none of the citations refer to the causal nexus which the Court has found lacking at the prima facie stage.